UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

v.                         Case No. 8:19-cv-

ASSETS IDENTIFIED IN
PARAGRAPH ONE OF
VERIFIED COMPLAINT,

     Defendants.

## **VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

In accordance with Rule G(2) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, Plaintiff United States of America brings this complaint and alleges upon information and belief as follows:

## **NATURE OF THE ACTION**

1.    This is a civil action in rem, to forfeit to the United States of America, the following defendant property:

        a.    The real property, attachments thereto, and appurtenances thereon, located at: 13318 Lost Key Place, Lakewood Ranch, Florida;

b. The real property, attachments thereto, and appurtenances thereon, located at: 6922 LaCantera Circle, Lakewood Ranch, Florida;

c. The real property, attachments thereto, and appurtenances thereon, located at: 4064 Founders Club Drive, Sarasota, Florida;

d. The real property, attachments thereto, and appurtenances thereon, located at: 7312 Desert Ridge Glen, Lakewood Ranch, Florida;

e. The real property, attachments thereto, and appurtenances thereon, located at: 444 Gulf of Mexico Drive, Longboat Key, Florida;

f. The real property, attachments thereto, and appurtenances thereon, located at: 17006 Vardon Terrace, #105, Lakewood Ranch, Florida;

g. The real property, attachments thereto, and appurtenances thereon, located at: 16804 Vardon Terrace, #108, Lakewood Ranch, Florida; and

h. The real property, attachments thereto, and appurtenances thereon, located at: 16904 Vardon Terrace, #106, Lakewood Ranch, Florida,

(collectively, the Defendant Properties).

## **VENUE AND JURISDICTION**

2. Venue properly lies in the Middle District of Florida pursuant to 28 U.S.C. § 1395, because the Defendant Properties are located within the district.

3.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1345, which provides the Court with jurisdiction over all civil actions commenced by the United States, and pursuant to 28 U.S.C. § 1355, which provides the Court with jurisdiction over actions to recover or enforce forfeitures.

4.      This Court has *in rem* jurisdiction over the Defendant Properties because pertinent acts giving rise to the forfeiture occurred in the Middle District of Florida. 28 U.S.C. § 1355(b)(1)(A).

5.      Pursuant to Rule G(3)(a) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, and 18 U.S.C. § 985(c)(2), a notice of this forfeiture, as well as a copy of the complaint, shall be posted on the pieces of real property and served on the owners of the real property. Thereafter, neither the issuance of a warrant *in rem* nor any other action will be necessary for the Court to establish *in rem* jurisdiction over the Defendant Properties. 18 U.S.C. § 985(c)(3).

## STATUTORY BASIS FOR FORFEITURE

6.      The Defendant Properties represents proceeds of violations of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud), or a conspiracy to commit mail and wire fraud (18 U.S.C. § 1349) and are, therefore, subject to civil forfeiture by the United States, pursuant to 18 U.S.C. § 981(a)(1)(C). Section

981(a)(1)(C) provides for the civil forfeiture of any property, real or personal, which constitutes or is derived from proceeds from any offense constituting "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such offenses.  18 U.S.C. § 981(a)(1)(C).  Section 1956(c)(7)(A) incorporates the racketeering offenses under 18 U.S.C. § 1961. Mail and wire fraud offenses in violation of 18 U.S.C. §§ 1341 and 1343 are specified unlawful activities under 18 U.S.C. § 1691(1).  *See* 28 U.S.C. § 9841(a)(1)(C), 18 U.S.C. § 1956(c)(7)(A), and 18 U.S.C. § 1961(1).

7.    Additionally, the monetary transactions made to purchase the Defendant Properties were conducted in violation of 18 U.S.C. § 1957(a) because they were knowingly conducted with more than $10,000 in funds derived from specified unlawful activity (specifically, wire fraud), and, as such, they are subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

8.    Specific facts supporting the forfeiture of the Defendant Properties have been provided by Richard Volp, Special Agent of the Federal Bureau of Investigation (FBI), who states as follows:

## FACTS

9.    Richard Volp has been employed as a Special Agent with the FBI since September 2017 and is currently assigned to the Tampa Division, Sarasota Resident Agency.  He has been a sworn law enforcement officer

continuously since January 2007.  He has personally participated in this investigation and has witnessed many of the facts and circumstances described herein.  He has also received information from other law enforcement officers relating to this investigation.

## I.  SYNOPSIS OF CONSPIRACY

9.     In 2011, Michael DaCorta (DACORTA) and Joseph Anile II (ANILE) created a company soliciting investors' money called Oasis International Group (OIG or "OASIS" referring to various other shell companies operated by DACORTA and/ or ANILE containing the Oasis name). Within months of creating OASIS, Raymond Montie (MONTIE) invested a large sum of money. DACORTA almost immediately started using a portion of this money for personal expenses.

10.     From 2011 until the present, OASIS has solicited money from over 500 investors. Bank records from 2015 until January 2019 show OASIS received more than 65 million dollars in investors' money. Of this money, approximately one-third was sent offshore and lost in foreign currency (FOREX) trading, one-third was given back to investors as Ponzi payments for bogus investment gains, and about one-third was misappropriated by DACORTA, ANILE, and another principal OASIS employee, Francisco Duran (DURAN), for large personal houses, multiple luxury vehicles such as

a Porsche and Ferrari, and maintaining a very lavish lifestyle. As of November 2018, bank records show OASIS only has a small amount of the money remaining and would not be able to repay even the investors principle investment.

11.    There has been no other source of income other than new investor's money, thus creating a Ponzi scheme in which older investors are paid by new investors.[1] The very basis of this scheme is fraudulent in that it is impossible for OASIS to continue paying investors' money with no other revenue source.

12.    During this time, DACORTA and ANILE created a network of people to help recruit new investors. The investors were promised a guaranteed minimum 12% a year return on their investment plus an additional percent of anyone else they brought into the scheme as a new investor,

---

[1] "Ponzi scheme" refers to an investment fraud wherein clients are persuaded to invest based upon promises of a large profit at little to no risk.  Persons who engage in Ponzi schemes focus their attention on attracting new clients and make false and fraudulent promises that the clients' money will be invested for a higher than normal rate of return.  In fact, when new clients invest, their money is used to pay earlier investors what the perpetrators characterized as their promised returns. Ponzi schemes rely on a constant flow of new investments to continue to provide returns to earlier investors.  In many situations, the persons operating the Ponzi scheme may actually use a portion of the investor's funds for actual investments, but will also use a portion of the investor funds to perpetuate the scheme and for personal use.  Once the new investment money runs out, the scheme will collapse because the perpetrators will not have the money needed to return to all the investors their principal investments.

typically close friends and family members of the victims. New investors were misled about how successful OASIS was and it was never disclosed to them the losses or inability to repay the current victims.

13.     To keep the scheme going, OASIS went to great lengths in lying to investors and providing fraudulent information regarding their success at FOREX trading. OASIS created a website where victims could log on each day to check their investment balance; money that appeared to be in their account but that OASIS had instead lost on trading or extravagant living costs. DURAN, DACORTA, and other recruiters repeatedly told new investors they were extremely successful in FOREX trading and, due to their sophisticated method of trading, had never experienced a month in which they did not make money, as well as that the investment was guaranteed when they could not back up that claim. The reality was they were losing millions of dollars every year without telling investors, but still providing fraudulent declarations to the contrary.

## II.     <u>BACKGROUND OF THE INVESTIGATION</u>

14.     This investigation involves allegations that from at least January 1, 2015 and continuing to the present day, unregistered entities and/or individuals are fraudulently soliciting U.S. individuals to pool their funds for FOREX trading as well as misappropriating those investments for use by the

principals of the company.  The entities implicated in the fraud include, but

may not be limited to: OASIS, an entity incorporated in the Cayman Islands,

and Oasis Management, LLC, a Florida-based entity registered in Wyoming.

The individuals implicated in the fraud include, but may not be limited to:

DACORTA, ANILE, DURAN, and others.  Many of the subjects of this

investigation, as well as real property purchased with fraud proceeds, are

located in the Middle District of Florida.

15.     This investigation was referred to the FBI by the United States

Commodity Futures Trading Commission (CFTC). According to the CFTF,

none of the aforementioned subjects, or any employees of OASIS, are licensed

to trade FOREX investments in the United States. Notwithstanding this fact,

CFTC staff located investors with OASIS who live in the United States. CFTC

staff have further determined that some customers residing in the United

States have been solicited by other investors and invited to participate in

conference calls with DACORTA (and possibly other OASIS employees),

during which time they were told that their funds would be used for foreign

currency trading (FOREX) and were promised a minimum 12% annual

return.  The CFTC stated that none of the identified subjects associated with

OASIS are licensed to deal with retail FOREX in an individual or pooled

capacity. This is in direct violation of various civil investment regulations.

16.    DACORTA's involvement in soliciting U.S. customers for

FOREX trading is particularly concerning because U.S. regulatory agencies

have received complaints about his mishandling of customer accounts in the

past.  From 2006-2010, DACORTA owned and operated a company called

International Currency Traders, Ltd (ICT).  DACORTA operated this

company in a manner similar to the way Oasis operates.

17.    In 2010, DACORTA entered into a settlement with the National

Futures Association (NFA) in which he agreed to withdraw from NFA

membership and not re-apply to avoid formal disciplinary action against him.

The NFA audit had noted multiple violations by DACORTA and ICT that

closely parallel the OASIS scheme to include: promising a 12% return on

loans investors made to ICT; repaying money owed to earlier investors with

loans from later investors; maintaining FOREX trading accounts managed by

ICT; making misrepresentations to solicit investors; and failing to adequately

warn potential investors about the risks of the investment.  DACORTA

initially contested the NFA's findings, but withdrew as a member of the NFA

and personally filed bankruptcy.  DACORTA opened OASIS in 2011, one

year after filing for bankruptcy.

18.    Furthermore, CFTC investigators have obtained bank records for

several of the entities involved in the alleged fraud and have provided

information and financial documents that show DACORTA, ANILE, and DURAN appear to be operating a Ponzi scheme and misappropriating investor funds for their own personal use.

19.     DACORTA's background: Operated ICT from 2006 until 2009. Filed for Bankruptcy in 2010. Started OASIS in 2011 and immediately began taking investors' money for personal use. The OASIS website stated the following information: "Mr. DaCorta is a co-founder, Director, Chief Executive Officer, and Chief Investment Officer of the Company with responsibilities for all investment decisions, trading execution, services, sales, clearing, and operations.  Mr. DaCorta has thirty-one years' experience trading numerous products, including equities, options, commodities, and currencies."

20.     ANILE's background: Joseph Anile II is a licensed attorney in the State of New York. It is not believed he is a practicing attorney. According to the OASIS website, it states the following for ANILE: "Mr. Anile is a co-founder, Director, and President of the Company with responsibilities for forming, staffing, guiding and managing its vision, mission, strategic plan, and overall direction.  Mr. Anile is highly regarded as a leading attorney in international finance and banking; he has significant experience in the areas of

business law, banking law, corporate finance, compliance, regulatory, and government affairs."

### III.    BANK ACCOUNTS USED BY SUBJECTS

### Oasis Management, LLC, Wells Fargo Bank account 9302

21.     On November 22, 2011, DACORTA opened a business bank account at Wells Fargo Bank in the name of Oasis Management, LLC with the account number ending in 9302 (Oasis Wells Fargo Account 9302). DACORTA used the address, 15 Pac Drive, Poughkeepsie, NY when opening the account.  The address was later corrected to 5 Pat Drive, Poughkeepsie, NY, which was DACORTA's home address at the time.  DACORTA is the only signor on the bank account.  On November 25, 2011, deposits were made to the account with references to "investments" on the checks.  Within the first six months of opening the account, Oasis Management, LLC received approximately $1,000,000 in deposits of investors' funds.  The account was funded almost entirely by investor deposits as there were no business revenues or investment earnings deposited to the account.  The money in the account was being used for groceries, restaurants, gas, travel, ATM or cash withdrawals, checks to himself (DACORTA), as well as smaller payments back to the same individuals (investors) who funded the account.  Some of the checks issued to the investors contained notes in the memo lines such as

"profit", "jan profit", "feb. profit", "profit sharing", "march profit", etc.  The "profit" checks paid to investors were funded by later investors' deposits, as in a classic Ponzi scheme.

22.    The Ponzi-type activity began in 2011, and it continues through the present. Due to the age of the transactions in the years 2011, 2012, 2013, and 2014, this Affidavit will focus primarily on more recent activity starting in January 2015 through the present.

23.    The Oasis Wells Fargo Account 9302 shows the following typical activity:

a.    This is the main bank account in which investors' funds have been deposited.  Bank records show that approximately 98% of the deposits to this account appear to be investor funds.  The identification of the source of the remainder of the deposits is currently unknown.  It is also the main account used to make interest payments and principal payments (back) to the investors (Ponzi payments);

b.    Funds were moved to Fundadministration accounts held at Bank of America;

c.    Funds were moved to Mainstream Fund Services accounts held at Citibank;

d.      Funds were used for DACORTA's personal expenses to include dining, shopping, travel, gas, entertainment, and asset purchases;

e.      Funds were moved to the property LLCs (described in more detail in the asset purchases section, below) to purchase and make payments on mortgages as well as for home improvements and maintenance;

f.      Funds were moved to DACORTA's personal bank account at Wells Fargo Bank; and

g.      Funds were moved to DACORTA associated business ventures, including "Roar of the Lion Fitness" and "Full Spectrum Wellness." Both of these businesses are believed to be DACORTA's son's business ventures.

24.     In 2017, Oasis Management, LLC started accepting IRA transfers from Third Party IRA administrators such as Equity Trust and Millennium Trust.  Oasis Wells Fargo Account 9302 shows large wire transfers deposited to the account from these Third Party IRA administrators. The client records show the individuals who requested the transfers of their IRA funds to Oasis Management signed Promissory Notes with Oasis Management.  Financial records show many current investors have invested their retirement savings in this scheme and are currently at risk of losing it.

25.     The method in which the investor funds are deposited to the account are: 1) bank wire transfers from the investors' bank accounts directly to the Oasis Wells Fargo Account 9302 or Fundadministration bank accounts (described in more detail below); and 2) checks are physically deposited into the Oasis Management, LLC bank account at Wells Fargo Bank branches around Lakewood Ranch, FL.  Because most of the investors are out of state investors, the checks appear to have been mailed to DACORTA or ANILE in Florida.  A mail cover placed on DACORTA's personal residence revealed a piece of mail addressed to Oasis International Group.  The mail was from an individual with the initials G.D. and an address in New York.  The mail was delivered to DACORTA's residence around December 18, 2018.   A review of the bank records indicate two checks were deposited to the Oasis Wells Fargo Account 9302 at a branch in Lakewood Ranch, FL from G.D. around the same date.

### Fundadministration Bank of America account 8346

26.     In approximately October 2013, Oasis Management began using fund administration services through a company called Fundadministration, Inc.  By way of background, fund administration services are used by fund managers and hedge fund managers for net asset value calculations, independent pricing, fund valuation, corporate actions, cash and asset

14

reconciliation, fund accounting, financial statements, and audit support. Essentially a hedge fund administrator is a bookkeeper that reconciles the hedge fund's accounts and often issues investor statements monthly. (In my opinion, the actual FOREX broker Oasis was using, ATC Brokers, preferred dealing with and receiving large wire transfers from fund administrators as opposed to business bank accounts like the Oasis Wells Fargo Account 9302.)

27.     The Fundadministration Escrow Account at Bank of America with the account number ending in 8346 (Fundadministration Bank of America Account 8346) was used by DACORTA and ANILE from October 2013 through March 2017. A review of the bank records shows approximately 98% of the deposits appear to be from investors or transfers from Oasis Wells Fargo Account 9302 and other Funadministration transfers. The identification of the source of the remainder of the deposits is currently unknown. There were no business income or investment revenues deposited into this account. The following is a description of the use of the funds:

     a.     Funds were used to make interest and principal payments (Ponzi payments) to investors;

     b.     Funds were used to transfer money to DACORTA's business venture, Full Spectrum Wellness;

       c.     Funds were used to transfer money to ANILE's business bank account, Bowling Green Capital, at Capital One Bank;

       d.     Funds were used to transfer money to the property LLCs to make mortgage payments and pay for home improvements and maintenance expenses at DACORTA's and ANILE's personal residences;

       e.     Funds were used to make the initial payment on DACORTA's personal residence; and

       f.     Funds were transferred to another Fundadministration bank account.

### Fundadministration Bank of America account 9550

28.    The Fundadministration account at Bank of America ending in 9550 (Fundadministration Bank of America Account 9550) was used by DACORTA and ANILE during the time period January 2017 to April 2017. This account was funded by wire transfers from the Fundadministration Bank of America Account 9631 (discussed below) and the Fundadministration Bank of America Account 8346. There were no business income or investment earnings deposited into this bank account. The funds were then wire transferred to ATC Brokers for FOREX Trading (explained in further detail later in this affidavit). Approximately $1.7 million was deposited into this

account, and approximately $1.7 million was transferred into ATC Brokers for FOREX Trading.

### Fundadministration Bank of America account 9631

29.     The Fundadministration account at Bank of America ending in 9631 (Fundadministration Bank of America Account 9631) was used by DACORTA and ANILE during the time period January 2017 to April 2017. This account was funded by investors' deposits as well as transfers from other Fundadministration bank accounts (9550 and 8346).  There were no business income or investment earnings deposited to this account.  The funds were used to make payments to investors as well as to transfer funds to other Fundadministration bank accounts.

### Mainstream Fund Services Citibank Account 0764

30.     In 2016, it was announced that Mainstream Fund Services bought Fundadministration, Inc. and the companies were to merge.  In April 2017, the Fundadministration accounts at Bank of America were closed and the funds were transferred to a Fundadministration account at Citibank ending in 0764.  In November 2017, the account name changed from Fundadministration to Mainstream Fund Services.  This account will be referred to as Mainstream Fund Services Citibank Account 0764.  This account was opened in February 2017 and is currently being used in this

scheme.  The account has been, and continues to be, funded by wire transfers from the Oasis Wells Fargo Account 9302 as well as investors' funds, directly. There have been no business income or investment earnings deposited into this account.  The bank records show approximately 98% of the total deposits to this account appear to be investor funds or transfers from Oasis Wells Fargo Account 9302 and the other Fundadministration accounts.  The following is a description of the use of the majority of the funds:

a.      Funds were used to make interest and principal payments (back) to investors;

b.      Funds were used to wire transfer money to ATC Brokers for FOREX trading.  Approximately $16,900,000 was transferred to ATC Brokers during the time period of the account opening until October 2018;

c.      Funds were used to transfer money to the property LLCs for property (loan) payments, home improvements, and home maintenance on DACORTA and ANILE's personal residences;

d.      Funds were used to transfer money to ANILE's business bank account, Bowling Green Capital, LLC at Capital One Bank for ANILE's personal use;

e.      Funds were used to make payments to DURAN;

   f.  Funds were used to make property and vehicle purchases (described in detail later in this affidavit);

   g.  Funds were used to transfer money to DACORTA's business venture, "Full Spectrum Wellness"; and

   h.  Starting in January 2019, the account was also used to purchase gold and silver.

### IV. BANK ACCOUNT SUMMARY

31.  When the transactions in the five business accounts described above are combined and the bank transfers between the accounts are eliminated, the flow of funds is telling. From the time period January 1, 2015 through January 31, 2019:

| | |
|---|---|
| Amount of investors' funds deposited: | $66,400,000 |
| Amount paid back to investors: | ($21,974,000)[2] |
| Amount transferred for FOREX trading: | <u>($19,625,000)</u> |
| Amount left over diverted/used by subjects: | $24,801,000 |

---

[2] This figure represents interest payments back to investors as well as payments to investors who requested their principal investments be returned.

### OASIS Management Money Flow



## V.    SOLICITATION/ REPRESENTATIONS BY OASIS REPRESENTITIVES

32.    During the course of the investigation, various investors were interviewed.  The following is a summary of what some of the investors or potential investors were told about investing money with OASIS:

### Interview with Individual #1

33.    On or about May 8, 2018, CFTC investigators spoke with Individual #1 regarding concerns she/he had relating to OASIS.  Individual #1 became aware of OASIS through a family member who had invested. Individual #1 participated in a conference call with OASIS representatives in which they (OASIS) attempted to recruit investors.

34.    Individual #1 stated that a couple of the principals of OASIS were on the conference call promising a 12% return on money that investors "loaned" OASIS.  The names of these subjects were not provided to Agent Volp.  The principals told potential investors that if OASIS made more money trading, they would pay a higher rate of interest than the promised 12%.

35.    OASIS representatives reported they used investor funds to trade [FOREX] currencies "at a high rate of speed… making a phenomenal number of trades per day."  Individual #1 was concerned about the legitimacy of OASIS in part because she/he noticed on the OASIS website that it said they

did not make transactions in America.  Individual #1 ultimately elected not to invest any money with OASIS.

## Interviews with Investor #1 and Investor #2

36.    Investigators interviewed Investor #1 and Investor #2. Investigators learned that both are investors in OASIS.

37.    Investor #1 was introduced to OASIS through her affiliation with Ambit Energy.  Later, Investor #1 was introduced to Raymond MONTIE.  In turn, MONTIE informed her of the investment opportunity in OASIS.

38.    Subsequent to the introduction to MONTIE, Investor #1 and Investor #2 invested in OASIS.  Investor #1 stated she invested $15,000 and Investor #2 invested $13,000.  Investor #1 advised that they both withdraw the monthly interest that is earned and use it as a form of retirement income. Investor #1 informed investigators that they invested earlier in 2018.  Investor #1 admitted she didn't know how to handle the withdraw amount for tax purposes, and no one has provided guidance.

## Interview with Investor #3

39.    Investigators spoke with Investor #3, who identified herself as an investor.  Investor #3 stated that she and her husband invested earlier in 2018. Investor #3 advised they have received approximately 15% return this year.

However, Investor #3 was cautious with continuing to receive future returns and that her husband was not one-hundred percent certain with investing with OASIS.  Investor #3 was introduced to DACORTA through her neighbor. After meeting DACORTA, Investor #3 and her husband decided to invest in OASIS.  Note that Investor #3's criminal history shows that she was charged with making fraudulent statements related to a public office he/she was running for.

### Information from Investor #1 and MONTIE

40.     Investigators spoke with Individual #2, an individual who expressed an interest in investing in OASIS but has not yet invested. Individual #2 advised that he spoke with Investor #1 who, in turn, called MONTIE and placed them on a conference call together to discuss OASIS.

41.     MONTIE spoke about investing in Ambit Energy and about another investment opportunity called OASIS. MONTIE advised he started OASIS with DACORTA and "had done real well with our investors" and last year they "turned" just over 20% and the year before 22% [interest].

42.     MONTIE then exited the conference call, and Individual #1 continued to speak with Investor #1.  Investor #1 stated that she is guaranteed at least 12% return on her investment each year, but last year her return was 22%.  In addition, Investor #1 receives 25% of the return of anyone whom she

brought into OASIS.  Investor #1 advised that each month she can receive a check for her interest, but investors have to wait 90 days before withdrawing the principle investment. Investor #1 described the investment as an investment in FOREX trading.  When asked who was responsible for the trades, Investor #1 advised it was "Mike" [DACORTA] who had been an investor on Wall Street.  Investor #1 stated "Mike" DACORTA, MONTIE, and a lawyer Joe [ANILE] who had worked with DACORTA before.  The lawyer (ANILE) reportedly told DACORTA and MONTIE he could set up the paperwork for their company but that he really wanted to be a partner. Investor #1 also knew of other employees such as John Haas (HAAS) whose job was to take care of all of the IRA accounts.

43.    During the past year Investor #1 has been invested with OASIS, she has made money every month.  Each night Investor #1 logs onto her OASIS account (via website) and checks to see how much money they made that day.  If she ever wanted to withdraw money, she would email Joe (believed to be Joseph ANILE based on the context of the conversation) or HASS depending on what account it was in.  Investor #1 stated she communicates with ANILE via their OASIS email account or by texting ANILE's personal cellphone number.

44.     Investor #1 stated there is a minimum investment amount of $25,000 or $75,000 for IRAs.  Investor #1 stated she initially invested $15,000 but received an email from OASIS saying they raised the minimum up to $25,000 for new investors.

45.     Investigators received a copy of the email received by Investor #1.  The email was dated January 11, 2019 and was from DACORTA.  The email also states all new "loans" should be initiated through this link, https://www.oasisigltd.com.  The email contains DACORTA's contact information at the bottom: Michael DaCorta, CEO & Chief Investment Officer, Cell 941-807-9933, Email mdacorta@oasisig.com.

**Meeting with Investor #1**

46.     Following their call, Individual #2 met with Investor #1 and Investor #2 about obtaining investment information from the couple regarding Ambit Energy and OASIS.

47.     Investor #1 told Individual #2 she met MONTIE through an Ambit Energy investment opportunity. Investor #1 made money each month based on the principal she invested as well as referral money from other investors she brought in.

48.     Investor #1 stated the only time that money has ever been lost in OASIS was during the very first month OASIS was open and that the money

was MONTIE's. When asked how she knew this, Investor #1 stated that

MONTIE told her the information.

49.     Investor #1 started investing with OASIS through MONTIE,

who had an OASIS employee John HAAS call her and set up the investment.

Investor #1 further stated MONTIE gave her a referral bonus for someone

who had invested $900,000 but had not been referred by another investor. This

bonus was 25% of whatever that investor was earning.

50.     When asked what the investment was in, Investor #1 stated the

only thing she could understand is that it was in currency overseas. Investor

#1 further stated her understanding was that her money is put into a bank and

it provides OASIS buying power to keep turning the money over and over

again with their [OASIS'] money. Investor #1 stated that she does not believe

her money is "out there" being risked but rather was sitting in a bank and

being used as collateral.

51.     Investor #1's understanding is that DACORTA is doing the

trading for OASIS.

52.     Investor #1 said WILSON helped Investor #1 fill out all of the

paperwork to get started. OIG was the "big stuff" and Oasis Management

took care of the "smaller stuff" until they combined them 6-7 months ago so it

was under the same umbrella. Under OASIS Management, Investor #1 would

have only received a 10% referral but since they combine it with OASIS International Group, all of the referrals are 25%.

53.     Last year Investor #1 received almost 22% interest on her investment.

54.     Investor #1 then showed Individual #2 the OASIS website which showed how much money OASIS had in her investment account. It was Investor #1's understanding that ANILE is in charge of the website.

55.     Investor #1 was given a user name and password so she is able to view her personal account. The account shows multiple rows of numbers showing how much interest Investor #1 had earned each day during the current trading month (due to each day the amount earned fluctuated). There were additional categories for the daily interest earned from referral investors and information on the money earned the previous month. Investigators know this to be fraudulent in that OASIS had been losing money each month at an alarming rate.

56.     Investor #1 pointed out one instance in which she withdrew $5,000 from her account. In order to do that, Investor #1 stated the procedure was to email "Joe" (believed to be Joseph ANILE based on the context of the conversation) on his OASIS email account and request the withdrawal.

ANILE then called Investor #1 and spoke with her on the telephone to confirm she wanted to proceed with the request.

### Individual # 2 Meeting with Frank Duran

57.     Individual #2 met with DURAN and other OASIS' employees at their headquarters building located at 444 Gulf of Mexico Drive, Longboat Key, Florida. The following is a synopsis of that meeting:

58.     DURAN told Individual #2 that he met DACORTA and after speaking with him about FOREX trading, DURAN told DACORTA he wanted to work with him and OASIS managing their daily operations. DACORTA is said to be the person "who manages all of the traders" and "is the lead trader." ANILE was said to be DACORTA's "partner" and an attorney. Another partner is Ray MONTIE.

59.     DURAN said DACORTA went into Wall Street right out of college and by the age of 28 had his own firm. DURAN stated that following the 2008 "meltdown," DACORTA "looked his investors in the eye" and said that he couldn't make the same kind of money so he "pulled back" and "refunded them all of their money."

60.     After the market began to stabilize, DACORTA began trading his family's wealth and assets at which time MONTIE approached him to trade MONTIE's money. DURAN said that MONTIE kept bringing

28

DACORTA more and more investors at which time DACORTA advised MONTIE they should do things properly.  ANILE then set up the license through the Cayman Islands while the money goes through the United Kingdom.

61.    DURAN explained that DACORTA is buying currency in volume at wholesale prices.  DURAN stated that, typically, OASIS never holds currency for more than seconds.  DURAN warned that everything always has risks  but if they lost money they [the investor] would have bigger problems and would have to go to the supermarket with a shopping cart full of money [due to inflation].  DURAN further stated that every day he can go onto his account and check to see how much money they made that day.

62.    DURAN described the way the investment works is that the investor lends money to OASIS and, in return, gets a 90-day perpetual note.  DURAN gave an example of an investor from Chicago who invested $7 million with OASIS but needed a portion of the money for a closing on a real estate deal.  The investor was able to take a portion of his investment principal out of OASIS for closing costs and then reinvest it with OASIS after the deal was done.  DURAN stated it typically takes about three days to take someone's money out of the investment because it takes time for the money to come back from the foreign accounts and into the OASIS accounts.

63.     DURAN stated that every day at 7:30PM, investors can look to see how much money is in their accounts (via website).  (Investigators believe OASIS is committing wire fraud in each of these instances in that the total amount of money stated to be in the investors' accounts is a fraction of the money that OASIS actually has in its accounts.  Furthermore, the impression given that OASIS is making money each day is not supported by trading records showing OASIS has lost millions of dollars in FOREX trading.)

64.     DURAN stated OASIS is trading from 5PM on Sunday until 5PM Friday each week.  DURAN later stated they have two other traders, one located in New York and the other in Tampa.  According to DURAN, the three traders were said to work in shifts so that OASIS is trading FOREX 24 hours a day every day.

65.     At the end of the month, OASIS gives investors different options with the money they earned. The investor can keep the interest invested or withdraw a portion.  DURAN guaranteed a minimum of 1% return each month and if OASIS wasn't able to do that with trading, they "make up the difference, which happens temporarily." DURAN added that there are months that slow down but in 2018 they "closed out" at almost 21%.

66.     DURAN stated that on any given day OASIS trades between $1.1 billion to $1.5 billion.  DURAN further said that OASIS puts most of the

profits they generate each month back into the platform.  DURAN stated that

investors receive up to 25% of the profit OASIS makes while OASIS keeps the

other 75% of the profit to pay all of the expenses such as payroll, referral fees,

and real estate costs.  (Note that trading records and bank records reveal

OASIS does not make any profits)

67.     DURAN stated that by being positioned offshore, if there is an

issue with the United States currency, DACORTA can switch to a more

favorable currency "within nanoseconds."  When asked to explain what he

meant, DURAN stated that OASIS makes money by buying large quantities

of foreign currency, as much as $50 million at a time, and then setting the

selling price at fractions of a penny over what OASIS paid thus making a

profit.  DURAN stated OASIS is managing approximately $100 million and

turns that money over 10-12 times a day (thus reaching over a billion dollars in

trades each day).  DURAN stated last year they traded as much as $6 billion

in a single day and "two months ago we did $12.5 billion in one day."

68.     DURAN stated OASIS is a dealer broker and licensed through

the Cayman Islands and Belize, and OASIS goes through the UK (for

trading).  He further stated all of their trades are cleared through a third party

platform so that there is no chance for fraud or mismanaging the money.

DURAN stated DACORTA is a workaholic and loves to stay late at night.

69.     DURAN stated one of the things OASIS does when they raise capital is purchase real estate such as their office building. When asked further, DURAN said that OASIS buys very little real estate and "only what we [OASIS] are using." DURAN further stated OASIS purchased the houses that DACORTA, ANILE, and he lived in.  According to DURAN, OASIS is only buying distressed properties such as ones that are foreclosed, but that OASIS is not going to buy a lot of properties because they could never get the return on their investment OASIS can with FOREX trading. Real estate records show that the majority of properties purchased by OASIS were neither distressed nor in foreclosure and number approximately nine locations, one of them being a condo in which DACORTA's son lists as his residence.

## Email from DURAN Containing Promissory Note

70.     Investigators received a copy of an email that an individual received from fduran@oasisig.com [DURAN] which contained instructions on where to wire transfer investment money as well as a second email containing a sample promissory note.

71.     In the instructions, DURAN wrote to wire any investment money to the following bank account:

    a.     Mainstream Fund Services, Inc.
           4175 Veterans Memorial Hwy., Ste. 204
           Ronkonkoma, NY 11779

b.      Citibank Account: 6780060764

c.      Bank ABA #: 021000089

d.      Reference: fbo Oasis International Group, Ltd.

72.     In the sample loan agreement, the loan agreement is between

Oasis International Group, Ltd. and CM & WM (other investors names was

not erased from the note).  The note states the interest rate earned would be

the greater of twelve percent (12%) per annum, or twenty-five percent (25%) of

the Transaction Fees. The note appears to be a basic Promissory Note.  The

note is signed by DACORTA and lists him as the Chief Executive Officer.

**Agreement and Risk Disclosures**

73.     Investigators learned from Individual #2 that, at one point,

DURAN sent the individual directions to sign up for an account on the Oasis

website (Oasisigltd.com).  Individual #2 then registered for the website and

noticed a box to check to indicate an agreement was read.  The agreement

linked to a document called "Agreement and Risk Disclosures."  The

document starts off by saying "This agreement sets forth the terms and

conditions governing your Loan Account ("Account") at Oasis International

Group, Ltd ("Oasis"), and all agreements and any transactions in this account

with Oasis . . . ."  The document is 9 pages long and contains a paragraph

titled "Use of Funds."  This paragraph states "At any time, in Oasis' sole

33

discretion and without prior demand or notice, Oasis may use any or all money loaned by Lender, including any interest thereon, for any purpose whatsoever including without limitation any investment; the purchase or sale of foreign exchange products, securities or commodities, exchange or off-exchange productions; the purchase or sale of any businesses assets or liabilities, the purchase or sale of any real estate' or for any other purpose, including general company use or payment, any company payment or loans to any company affiliate, officer, or employee, or third party, any company indebtedness or other company obligations."

74.     To date, it is unclear if any of the investors received and/or read this document.  It is clear, though, from the investors that were contacted about their investment with OASIS that an investment with the company will be used, in some capacity, for FOREX trading.  It is further believed by the individuals that were contacted that Oasis is successful at FOREX trading. Based on my training and experience, it is highly unlikely that investors would have handed their own personal funds or retirement funds over to Oasis so DACORTA, ANILE, and others could purchase and live in million dollar houses, drive luxury vehicles, pay their children's college tuition and student loans, fund their children's businesses, purchase their children vehicles and condominiums, and live an extravagant lifestyle.

**Individual #2 Phone Call with Frank DURAN**

75.     Individual #2 reported to investigators that he spoke with DURAN via telephone regarding some questions pertaining to the loan agreement paperwork he/she had received from OASIS. DURAN assured the individual that "when you click [to accept the terms]… you're not agreeing to the terms, you are only acknowledging that you read it." Nothing is binding you to anything and that it is just saying that you read the disclosure.

76.     Individual #2 reported that he told DURAN that the language in the agreement appeared to suggest OASIS was using the investment money to purchase real properties. DURAN stated, "You are not being paid for profits or transactions on real estate." He explained as a company OASIS buys real estate, silver, and gold in order to shore up their position. The note is guaranteed by the parent company and the parent company is the owner of all of the assets.

77.     DURAN explained they [OASIS] can make more than 12% because they are trading in foreign currency not relying on real estate. He stated, "You are lending the platform money as a hard money lender. So to use your money to buy and sell currency we are guaranteeing you a floor of one percent (1%)…. "Last month we did something like .89% but everyone got the 1%." He also stated last year OASIS "closed at almost 21%" suggesting they made a

substantial profit trading FOREX instead of the substantial losses financial records indicate.

78.     DURAN explained, "We also buy silver and gold and we have possession of it which is also to shore up our strength. If something were to happen to the US currency we have enough gold in possession that no one in the platform will miss a beat because, let's say the dollar devalues to 80%... what would happen of course would be gold and silver would go up like twenty fold. We have a formula for what we have on hand in cash and what we need in gold to hit to exceed that number in case the dollar devaluates."

79.     DURAN said he did not know of another investment firm who backed up the investment this way and that it gave them the ability to switch to another currency that at the time might be more safe [sic] until the dollar stabilizes."

80.     DURAN made the following misrepresentations to Individual #2 regarding these purchases:

a.     "The lender money is used specifically and strictly for trading. That's what the money is used for."

b.     "The idea is that you are generating a return on your money without having your money at a high risk or exposure. "

c.      "All of the expenses to operate this platform come from the house side. Real estate expenses, payroll expenses, sending wires, legal costs, administration, all of that comes from our 75[%]."

d.      "If we have a month that we fall short, like we did this month, we will make up the difference so you will always make your guarantee."

e.      "You will never have a depreciation of your capital. Your capital always appreciates, and there is never a scenario where your capital depreciates."

81.      DURAN stated he brought on alot of other people he knew and "everyone is doing phenomenal." He explained they want to put the money someplace that it is relatively safe and there is a low risk factor. The reality is that FOREX trading is often times volatile and is highly speculative."

**Individual #2 Phone Call with DURAN and DACORTA**

82.      Individual #2 reported to investigators that he also received another telephone call from DURAN during which DURAN stated he had DACORTA on the other line, suggesting the two were not co-located and at least one of them was not at OASIS headquarters.

83.      DACORTA explained that once an investor invested the money and it was received by OASIS, either Deb [Cheslow] or Joe [Paniagua] then

goes in and switches the investor into a "live" status; the note with how much the investor deposited will automatically be in the "back office", and at that point the investor can log in [to the OASIS web site] and view his or her account. The approval to access the full account happens after the investor actually wired the funds to OASIS.

84.     Individual #2 then advised DACORTA that he read the "Agreement and Risk Disclosure" document and that he assumed they had a lawyer draft that document to which DACORTA stated it was drafted by an attorney who would look at what OASIS does and include "every possible thing that could possibly go wrong in advance even though 99% of the stuff in there we don't do you still have to say it because technically they just make you say it."

85.     DACORTA stated the reason they [OASIS] purchase real properties with their [OASIS] own funds is to have "hard assets" along with significant quantities of gold and silver.  DACORTA stated that it provides assets versus just having cash sitting in various banks. DACORTA explained this was to hold assets should the US currency collapse.  DACORTA stated OASIS invests the majority of their proceeds back into "the platform" in order to build a larger "buffer" between OASIS' capital and any lender capital.

DACORTA further stated that once enough money is built up, OASIS invests the money in real estate and physical gold and silver.

86.     DURAN then stated the idea behind having gold and silver was in case there was a systemic meltdown beyond anyone's control they would be able to protect everyone's principal [investment].  DURAN further stated that with investing in OASIS, every month you would have a positive gain on your investment unlike typical investments.

87.     Individual #2 advised that he asked DACORTA if there was ever a month or year in which they lost money. DACORTA explained the way OASIS trades FOREX they will never end a day in a negative position.

88.     Individual #2 then asked DACORTA about the real estate investments and stated he did not want his investment going towards more real estate. DACORTA stated the real properties are meant to provide hard assets for OASIS. DACORTA said that OASIS trades FOREX for "hundredths of a penny" but that they deal in large volume to make money.

89.     DACORTA then stated that the value of the real estate, gold, and silver purchased in addition to the cash on hand adds up to significantly more money than the money lent to OASIS by investors.  This statement is of great concern because the bank records show this to be not true and the amount of money owed to investors is believed to be significantly higher than

the total of all of OASIS' assets.   It is believed OASIS would be short more

than $30 million if all the investors requested their entire principle investment

back.

90.     Individual #2 told investigators that he then quoted a portion of

the Agreement and Risk Disclosure to DACORTA which stated the

following: "OASIS is compensated for services through the use of funds

loaned by the lender" and asked DACORTA if he was taking a salary or if any

of the money he was lending was going to DACORTA. In response,

DACORTA stated: "No we don't take any of the money but basically what we

are doing is we're using your money to do the transactions and we're earning

something off of those transactions." Again this is a misrepresentation because

bank records show DACORTA, ANILE, and DURAN use large amounts of

investor funds for personal expenses and there are no earnings or revenues.

### February 8, 2019 Interview of Individual #3

91.     Individual #3 was interviewed via telephone on February 8, 2019

about a tip he submitted regarding a suspected investment fraud.  Individual

#3 provided the following information:

92.     Individual #3 submitted an online tip to the FBI's National

Threat Operation Center (NTOC) to report OASIS as being involved with

potential fraud or a Ponzi scheme.  Individual #3 advised that a colleague of

his brought an investment opportunity to the attention of Individual #3 and

asked for some professional advice.  The colleague explained that his client

had a friend who invested with OASIS and was guaranteed a rate of return of

12% based on a promissory note.  Moreover, OASIS was making money by

cutting the bid/ask price and that is how OASIS was making a profit and

never losing any money.  Individual #3 was skeptical that any brokerage could

make money using this method since other, large brokers would already do it

if feasible.  Individual #3 heard OASIS was offering up to 25% rate of return

of whatever their strategy made trading in the foreign exchange market place.

### Interview with Individual #4

93.    The Securities and Exchange Commission (SEC) received

information from Individual #4 who was a potential investor with OASIS.

Individual #4 said he attended a conference for his employment in January

2019, and one of his co-workers approached him about investing with OASIS.

Individual #4 was provided some information about the company and was

later invited to attend a conference call with OASIS and other potential

investors.  Individual #4 provided the conference call number and PIN.  The

phone number for the conference call is assigned to FreeConferenceCall.com,

which is a free conference call service.

94.     Individual #4 called in for the conference call.  Individual #4 believed there were several other potential investors on the call.  There were also representatives of OASIS on the call.  An individual named Michael DACORTA did most of the talking on the call.  DACORTA talked about how he used to trade stocks for 16 years and was tired of trading stocks and moved into FOREX trading.  DACORTA said last year OASIS made 21% for the investors.  DACORTA talked about how the investors could log into a portal to check their investments every day.  DACORTA said that the only way this would be a bad investment is if the world banks all closed, then he would switch over to trading gold.

## VI.   ACTUAL TRADING RESULTS

### FOREX Trading – ATC Brokers Ltd.

95.     The Wells Fargo Bank records as well as the bank records for the Fundadministration/Mainstream Fund Services accounts identified the brokerage firm that Oasis used to trade FOREX.  Wire transfers were made from the Fundadministration/Mainstream Fund Services accounts to ATC Brokers Ltd. at bank accounts in London.  The CFTC made a request to the Financial Conduct Authority in London.  In response to this request, the CFTC received Oasis trading records and account records from ATC Brokers.

96.     ATC Brokers received a Corporate Application for a Foreign

Exchange trading account in the name of Oasis Global FX Limited on April

13, 2015.  The application was submitted by ANILE and lists Michael

DACORTA as the CEO of the company.   To support the application for a

trading account, DACORTA and ANILE provided incorporation documents

from New Zealand for Oasis Global FX Limited along with incorporation

documents from the Cayman Islands for Oasis International Group Ltd.

Included in the incorporation documents were copies of passports, driver's

licenses and utility bills (for proof of residence) for DACORTA and ANILE as

officers of the corporation.  Both DACORTA and ANILE were

communicating via email with representatives of ATC Brokers.  DACORTA

was using email address mdacorta@oasisig.com, and ANILE was using email

address janile@oasisig.com.

97.     After the application was made, transfers were made to ATC

Brokers and FOREX trading took place.  The following is a summary of the

Oasis Global FX Limited deposits and trading activity:

        a.     For 2015, $349,831 was deposited into the trading

account.  By year end the account balance was $352,102.

b.      For 2016, the beginning balance was $352,102 and $1,300,000 was deposited into the account throughout the year.  The ending balance in 2016 was -$1,986 (negative).

c.      In summary, the entire amount of money that was transferred for FOREX trading was lost on the foreign currency exchange. None of the funds were withdrawn from the account; all of the funds were traded and lost.

98.     On December 28, 2016, ANILE submitted another account application to ATC Brokers for another foreign exchange trading account in the name of Oasis Global FX, S.A., a company incorporated in Belize.  The application included a Financial Institution Questionnaire that lists ANILE as the Director of the Belize corporation and DACORTA as the Chief Investment Officer.  There is an Omnibus Agreement included that lists ANILE as the President of the company and DACORTA as the Trading Officer of the company.  The account was opened and was funded with wire transfers from the Fundadministration/Mainstream Fund Services accounts. The following is a summary of the deposits and trading activity for Oasis Global FX, S.A:

a.      For 2017, $7,225,000 was deposited into the trading account, and the ending balance in 2017 was $7,271,718.18.

b.  For 2018 (until November 2018), the beginning balance in the trading account was $7,271,718.18, and $11,900,000 was deposited to the account, and the ending balance was $940,917.49.

c.  Nearly $18.2 million was lost in FOREX trading in 2018.

99.  In summary, nearly all of the funds that were transferred to ATC Brokers to trade FOREX have been lost.  The nearly 100% loss that OASIS incurred has not been disclosed to the investors of OASIS and is not being disclosed to new investors.  In fact, the opposite is being represented to investors, as referenced in the paragraph describing Investor #1's meeting with DURAN as well as a conference call that took place in January 2019 in which Individual #3  participated.  Moreover, Investor #1 and Investor #2 are led to believe OASIS is doing well as they can check their account balance with OASIS on a daily basis to see how much of a return on their investment is earned, daily.  Because they can see positive returns, daily, Investor #1 and Investor #2 believe the FOREX trading is profitable.

## Payments (Back) to Investors (Ponzi Payments)

100.  A review of the Wells Fargo and Fundadministration/Mainstream Fund Services accounts reveal OASIS did issue payments back to investors.  It is believed approximately $22 million was sent back to investors.  The payments appear to be investment return

payments as well as payments back to investors of their principal and partial principal.  The only source of funds OASIS had in the bank accounts to make these payments is investor funds.  The bank records show that any sort of business revenue stream or investment earnings does not exist.  Therefore, the funds used to make payments (back) to investors is from other investors (Ponzi payments).

101.   Based on a review of the deposits to the OASIS Wells Fargo and Fundadministration/Mainstream Fund Services bank accounts, it is believed there are over 500 investors in this scheme.  Some of the investors have removed their entire principal balances from OASIS and have been made whole, while others are still invested with OASIS.  It is believed that OASIS is currently paying the investors their promised returns and therefore none of the investors have reported investment losses.  In reality, bank statements and trading records show OASIS would only have a fraction of the money needed to pay back all of the investors their principal investments. In fact, it is believed OASIS would be short over $30 million.

## VII.   COMPENSATION/INCOME OF SUBJECTS

102.   Whether there are compensation contracts or agreements for DACORTA, ANILE and DURAN with OASIS is currently unknown.  The business does not have a source of revenue or investment earnings to

compensate the officers of the corporation.  Based on my experience, and that of other agents associated with this investigation, an investment business similar to OASIS would need to generate some sort of revenue or earnings to compensate the officers or employees of the corporation.  Based on the investigation to date, investors are being told their investments or funds transferred to OASIS are being used in the FOREX market.  Investors are not being told their funds are being used for the personal benefit, including the large houses and luxury cars, of DACORTA, ANILE, DURAN and others, as detailed below.

103.   In addition, Federal Individual Income Tax Return filings for the subjects do not support the lifestyles these individuals currently have. DACORTA files Federal Income Tax Returns, Forms 1040, each year.  For the tax years 2014 through 2017, DACORTA had no taxable income in any of those years.  In fact, DACORTA reported a negative Adjusted Gross Income (losses) in 2016 of $99,430 and $439,026 in 2017.

104.   ANILE files Federal Individual Income Tax Returns, Forms 1040, each year as well.  He reports some income from Bowling Green Capital as his only source of income.  ANILE reported taxable income of $36,072 in 2014, $18,078 in 2015, $27,032 in 2016, and $53,489 in 2017.

105.   DURAN last filed a Federal Individual Income Tax Return, Forms 1040, in tax year 2014 with his former wife.  DURAN has not filed tax returns for tax years 2015, 2016, 2017, and 2018.  In addition, DURAN owed the IRS over $190,000 for several years, and it was recently written off by the IRS as uncollectable in August 2018.

106.   Despite the lack of supportable income, DACORTA, ANILE, DURAN and others, have been able to live extravagant lifestyles by diverting investor funds for their own use.

## V.   TRACING OF SUBJECT ASSETS

107.   Bank records show that, during the course of the scheme, DACORTA, ANILE and DURAN have been diverting investors' funds for their own personal use.  The methods used to divert the funds differ for each of the subjects.  Bank records show DACORTA is using funds from the Oasis Wells Fargo Account 9302 for himself by transferring funds directly to his personal bank account or credit cards as well as to DACORTA's LLC bank accounts held at Wells Fargo, and transferring funds to DACORTA's (or his son's) other business ventures, Full Spectrum Wellness and Roar of the Lion Fitness.  DACORTA is using the funds for gym memberships, travel, vacations, restaurants, groceries, shopping, college tuition for his daughter, Amazon purchases, art work, furniture, and other personal expenses.  In

summary and from the time period January 1, 2015 to January 31, 2019, a review of bank records revealed that the Oasis Wells Fargo Account 9302:

    a.    Received approximately $22,900,000 of investor funds deposited to the account;

    b.    Paid back approximately $5,507,000 to investors in Ponzi payments;

    c.    Transferred approximately $386,050 to DACORTA's personal bank account;

    d.    Transferred approximately $168,000 to DACORTA's business bank account in the name of 13318 Lost Key Place, LLC[3];

    e.    Transferred approximately $176,500 to DACORTA's business bank account in the name of 6922 Lacantera Circle, LLC;

    f.    Transferred approximately $245,000 to DACORTA's business bank account in the name of Full Spectrum Wellness, LLC;

---

[3] In addition to the Subject Vehicles sought for seizure and forfeiture herein, DACORTA, ANILE, DURAN and others also diverted approximately $6,700,000 of funds involved in the scheme to purchase a number of real properties for their own personal use. They typically set up LLCs that corresponded to the property's address (e.g., "13318 Lost Key Place, LLC" was set up to purchase the real property located at 13318 Lost Key Place, Lakewood Ranch, Florida), and opened a bank account in the name of the LLC which was later used to make monthly mortgage payments and to pay any other expenses related to the property. The United States will be filing a separate civil forfeiture complaint seeking the forfeiture of these real properties.

g.    Transferred approximately $154,900 to DACORTA's business bank account in the name of Roar of the Lion Fitness, LLC; and

h.    Transferred approximately $9,836,000 to the Fundadministration and Mainstream Fund Services bank accounts.

108.   The method ANILE uses to divert investor funds for his own personal use involves transferring funds from the Fundadministration/Mainstream Fund Services accounts directly to his Bowling Green Capital business bank account at Capital One Bank. The Bowling Green Capital account ending in 7485 (Bowling Green Account 7485) located at Capital One Bank NA was opened on August 11, 2009, and lists the signers as Joseph S. Anile II and MaryAnne E. Anile (ANILE's wife). A review of the bank records reveal 98% of the deposits to the account were from the Fundadministration/Mainstream Fund Services accounts (investor funds). ANILE also uses a bank account in the name of 444 Gulf Of Mexico Drive, LLC and 4064 Founders Club Drive, LLC to transfer funds from the Fundadministration/Mainstream Fund Services accounts for his own personal use. ANILE uses these funds to make purchases/payments on vehicles, withdraw money (cash) from ATMs, make payments on student loans, fund his son's collegiate sport career, moving expenses, restaurants, shopping, Amazon purchases, groceries, travel, home improvement stores,

and other personal expenses.  In summary and from the time period January

1, 2015 to January 31, 2019, ANILE's bank account received the following

from the Fundadministration and Mainstream Fund Services accounts:

     a.    Approximately $1,939,000 deposited to ANILE's Bowling

Green Account 7485;

     b.    Approximately $665,000 transferred to ANILE's business

bank account in the name of 444 Gulf of Mexico Drive, LLC;

     c.    Approximately $547,500 transferred to ANILE's business

bank account in the name of 4064 Founders Club Drive, LLC; and

     d.    Approximately $92,500 transferred to ANILE's business

bank account in the name of 4Oaks, LLC.

109.   The method DURAN uses to divert investor funds for his own

personal use involves him receiving either wires or checks in various amounts

from the Mainstream Fund Services Citibank Account 0764 and the 444 Gulf

of Mexico LLC bank account directly into his two personal bank accounts

located at JP Morgan Chase.  The account that receives the majority of the

transfers is his Chase Plus Savings account.  This account was opened on June

8, 2017 and lists DURAN as the sole signer.  Within the account, DURAN

made car purchases and transferred the remaining funds to his checking

account also located at JP Morgan Chase.  DURAN uses the funds to make

payments for rent, car loans, credit cards, education, restaurants, shopping, groceries and other personal expenses.  In summary and from the time period January 1, 2015 to January 31, 2019, DURAN received the following from the OASIS accounts:

a. Approximately $681,000 was transferred from the Mainstream Fund Services Citibank Account 0764; and

b. Approximately $25,000 was transferred from the business bank account in the name of 444 Gulf of Mexico Drive, LLC.

110.   The following assets have been purchased by the subjects using proceeds obtained through the scheme.

111.   In summary, and as will be detailed in each individual asset tracing section below, during the timeframe of this scheme, DACORTA, ANILE, DURAN and others primarily utilized the following accounts to divert investor funds for their own use:

a. Oasis Wells Fargo Account 9302 – At least 98% of total deposits appear to be investor funds;

b. Fundadministration Bank of America Account 8346 – At least 98% of total deposits appear to be investor funds or transfers from Oasis Wells Fargo Account 9302;

c.    Mainstream Fund Services Citibank Account 0764 – At least 98% of total deposits appear to be investor funds or transfers from Oasis Wells Fargo Account 9302 (or other investor funded accounts); and

112.   Bowling Green Account 7485 – At least 98% of deposits to the account were transfers from Fundadministration Bank of America accounts and Mainstream Fund Services Citibank Account 0764 (which, as noted above, were all funded with investor funds).

## A.    13318 LOST KEY PLACE, LAKEWOOD RANCH, FL

113.   In March 2016, DACORTA opened a Florida Limited Liability Company (LLC) named 13318 Lost Key Place, LLC to purchase his residence located at 13318 Lost Key Place.  DACORTA was listed as the Registered Agent of the LLC and the Title Authorized Member is listed as Oasis International Group, Ltd, 309 Ugland House, Grand Cayman.

114.   On March 18, 2016, four days after opening the LLC, DACORTA purchased his residence at 13318 Lost Key Place from Nathan and Heather Perry for $1,000,000.  This 5,000 square foot residence is located in the Lakewood Ranch Country Club, a gated community.

115.   The initial payment for the property was a wire from the Fundadministration Bank of America Account 8346 in the amount of $341,161.70 to Moyer Real Estate Services.  The Warranty Deed recorded

with Manatee County is recorded from Integrity Title Services at 6245 Lake Osprey Drive, Sarasota, FL.  The State of Florida Corporation records indicate Moyer Real Estate Services is located at 6245 Lake Osprey Drive, Sarasota, FL.  The Perrys issued a mortgage to the buyer, 13318 Lost Key Place, LLC for $650,000, the remaining balance.

116.   On April 12, 2016, DACORTA opened a business bank account at Wells Fargo Bank in the name of 13318 Lost Key Place, LLC.  DACORTA is listed as the only signor on the account.  A review of the business bank records reveals that 97% of the deposits were from Oasis Wells Fargo Account 9302 and Fundadministration/Mainstream Fund Services accounts which were funded with investor deposits.

117.   The account then used to make monthly payments to the sellers of the property, the Perrys, as wells as home improvements and home repairs. Monthly checks are written to the Perrys starting in April 2016 for $2,979.17. From April 2016 to January 2019, total monthly payments were made to the Perrys in the amount of $101,291.78.  In addition to the monthly loan payments to the Perrys, some of the other payments from the 13318 Lost Key Place, LLC bank account include checks issued to: Big Mike's Tile for $13,300, Air Clean of Florida for $4,670, Florida Design Works for $4,350, Electronic Impressions Inc. for $6,264, Travel Art II for $10,700, Alpha

Painting and Pressure Cleaning $7,800, Manatee County Tax Collector
(Property Taxes) for $49,669, as well as other home repair, home
improvement, and property tax payments.

118.   On February 19, 2019, a Satisfaction and Release of Mortgage
was filed with Manatee County Recorder's Office.  February 19, 2019, a wire
transfer was made from the Mainstream Fund Services Account 0764 to
Berlin, Patten, Ebling, PLLC in the amount of $653,293.67, which appears to
be the mortgage payoff.  Berlin, Patten, Ebling, PLLC is a full transactional
and real estate law firm in Sarasota, FL focusing on real estate related matters.

119.   In summary, DACORTA has diverted more than $1,000,000 for
the purchase of this residence as well as other maintenance, property taxes,
and home improvements for his personal residence.  Because the property was
purchased and funded with proceeds obtained from mail/wire fraud, it is
subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C). Additionally,
because the purchase of the real property was conducted in violation of 18
U.S.C. § 1957(a) (it was a monetary transaction knowingly conducted with
more than $10,000 in criminal derived funds), it is subject to civil forfeiture
pursuant to 18 U.S.C. § 981(a)(1)(A).

### B.     6922 LACANTERA CIRCLE, LAKEWOOD RANCH, FL

120.   On September 14, 2018, DACORTA opened a Florida LLC in the name of 6922 LaCantera Circle, LLC to purchase the property located at 6922 LaCantera Circle.  DACORTA is listed as the registered agent of the LLC and the Title Authorized Member is Oasis Management, LLC at 13318 Lost Key Place, Lakewood Ranch, FL.

121.   DACORTA purchased 6922 LaCantera Circle on September 21, 2018 for $2,125,000 from Nathan and Heather Perry (the same sellers on the 13318 Lost Key Place residence from 2016).  This residence is at 7,629 square foot house located in the same gated community as the Lost Key Place residence, the Lakewood Ranch Country Club.

122.   The initial payment for this property was a wire transfer from the Oasis Wells Fargo Account 9302 in the amount of $623,056 to Berlin Patten Ebling PPLC Trust with a memo that says "Real Estate Closing Ref 1813051001 Property 6922 LaCantera Cir Lakewood Ranch, FL 34202."  A Warranty Deed was recorded with Manatee County that was prepared by Berlin Patten Ebling, PPLC.

123.   A mortgage was also recorded from the sellers to 6922 Lacantera Circle, LLC in the amount of $1,500,000.  The mortgage is due in monthly

payments with a balloon payment in the amount of $875,000 due on September 1, 2022.

124.    On October 9, 2018, DACORTA opened a business bank account in the name of 6922 LaCantera Circle, LLC at Wells Fargo Bank. DACORTA is listed as the only signor on the account.  A review of the Wells Fargo Bank records indicate that 99% of the deposits were from the Oasis Wells Fargo Account 9302, all between October 2018 and February 2019.

125.    The 6922 LaCantera Circle, LLC account is then used to make monthly payments to the sellers of the property, the Perrys, as wells as home improvements and home repairs.  Monthly payments are sent to the Perrys starting in October 2018 for $6,250.  From October 2018 to February 2019, total monthly payments were made to the Perrys in the amount of $18,750.  In addition, home maintenance and home improvement payments were made to include: Adrian's Lawn Service for $9,325, Sticks and Stones Flooring for $38,158, FineCraft Custom Cabinetry for $34,229, and a payment to the Manatee County Tax Collector (Property Taxes) for $31,297.

126.    In summary, DACORTA has diverted more than $750,000 for the purchase of this residence as well as for other maintenance, property taxes, and home improvement expenses.   Because the property was purchased and funded with at least $750,000 in proceeds obtained from mail/wire fraud, it is

subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C). Additionally, because the purchase of the real property was conducted in violation of 18 U.S.C. § 1957(a) (it was a monetary transaction knowingly conducted with more than $10,000 in criminal derived funds), it is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

### C.   4064 FOUNDERS CLUB DRIVE, SARASOTA, FL

127.   On September 25, 2017, DACORTA opened an LLC in the name of 7202 Teal Creek Glen, LLC with DACORTA listed as the Registered Agent and Oasis International Group, Ltd as the Title Authorized Member. On October 18, 2017, ANILE filed for a corporation name change for this LLC to 4064 Founders Club Drive, LLC.

128.   On October 20, 2017, ANILE purchased his residence at 4064 Founders Club Drive, Sarasota, Florida, for $1,775,000 from Steven and Natalee Herrig. This residence is a 7,200 square foot residence in the gated community, The Founder's Club in Sarasota, Florida.

129.   The initial down payment on the property was wired from the Mainstream Fund Services Citibank Account 0764 in the amount of $703,753 to Berlin Patten Ebling PLLC.

130.    On the same date of the sale, a mortgage was issued from the sellers (to 4046 Founders Club Drive, LLC in the amount of $1,065,000.[4]  The mortgage terms state that interest only payments are to be made monthly with the full debt to be paid on or before October 20, 2021.  ANILE signed the mortgage document at the time of the sale.

131.    On December 6, 2017, ANILE opened a business bank account at Wells Fargo Bank in the name of 4064 Founders Club Drive, LLC.  ANILE and his wife, Mary Ann Anile, are the only signors on the bank account.  A review of the Wells Fargo Bank records reveals 99% of the deposits to the account are from Mainstream Fund Services Citibank Account 0764.

132.    Monthly mortgage payments are made to the Herrigs in the amount of $4,881.25.  The monthly payments were initially made from ANILE's Bowling Green Account 7485.  After the 4064 Founders Club Drive LLC bank account was opened, however, monthly mortgage payments were then made from this account to the Herrigs.  From February 2018 to January 2019, total monthly payments in the amount of $58,575 were made to the Herrigs.  The account is also used for personal expenses as well as home maintenance and home improvements to the property.

---

[4] It is believed the numbers in the purchasing LLC were transposed on this transaction.  This is why the property location and the purchasing LLC title do not match.

133.   In summary, more than $750,000 has been diverted for the purchase of ANILE's residence as well as other maintenance, property taxes, and home improvements for his personal residence.   Because the property was purchased and funded with at least $750,000 in proceeds obtained from mail/wire fraud, it is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C). Additionally, because the purchase of the real property was conducted in violation of 18 U.S.C. § 1957(a) (it was a monetary transaction knowingly conducted with more than $10,000 in criminal derived funds), it is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

### D.   4058 FOUNDERS CLUB DRIVE, SARASOTA, FL

134.   On March 1, 2018, a Florida LLC was created for 4058 Founders Club Drive, LLC.  DACORTA is currently listed as the registered agent with an address of 444 Gulf of Mexico Drive.  ANILE is listed as the Title Authorized Representative with the same address.

135.   On March 16, 2018, ANILE purchased vacant land located at 4058 Founders Club Drive, Sarasota, Florida, in the same neighborhood as his current residence.  The land was purchased by an LLC in the name of 4058 Founders Club Drive, LLC that listed a mailing address of 444 Gulf of Mexico Drive, Longboat Key, Florida on the deed.

136.    The land was purchased with a wire transfer from the Mainstream Fund Service Citibank Account 0764 to Berlin, Patten, Ebling, PPLC for $191,916.87 on March 15, 2018.  The purchase price of the land was $190,000 and there is no recorded mortgage for this property.

137.    Because the property was purchased with approximately $191,916.87 in proceeds obtained from mail/wire fraud, it is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C). Additionally, because the purchase of the real property was conducted in violation of 18 U.S.C. § 1957(a) (it was a monetary transaction knowingly conducted with more than $10,000 in criminal derived funds), it is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

### E.     7312 DESERT RIDGE GLEN, LAKEWOOD RANCH, FL

138.    On October 23, 2017, DACORTA opened a Florida LLC in the name of 7312 Desert Ridge Glen, LLC to purchase the property located at 7312 Desert Ridge Glen.  DACORTA was listed as the Registered Agent and the Title Authorized Member was Oasis International Group, Ltd.

139.    On November 3, 2017, 7312 Desert Ridge Glen was purchased as a residence for DURAN by 7312 Desert Ridge Glen, LLC for $575,000 from Centennial Bank.  This is a 3,800 square foot residence in the gated community of Lakewood Ranch Country Club.

140.    The property was purchased with a wire from the Mainstream Fund Services Citibank Account 0764 to Berlin, Patten, Ebling, PLLC in the amount of $600,000 on September 22, 2017.  The Deed recorded with Manatee County was prepared by Berlin, Patten, Ebling, PLLC.

141.    Because the property was purchased with approximately $600,000 in proceeds obtained from mail/wire fraud, it is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C). Additionally, because the purchase of the real property was conducted in violation of 18 U.S.C. § 1957(a) (it was a monetary transaction knowingly conducted with more than $10,000 in criminal derived funds), it is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

**F.    444 GULF OF MEXICO DRIVE, LONGBOAT KEY, FL**

142.    On October 30, 2017, DACORTA opened a Florida LLC in the name of 444 Gulf of Mexico Drive, LLC to purchase a commercial building located at 444 Gulf of Mexico Drive.  DACORTA was listed as the Registered Agent and Oasis International Group, Ltd. was listed as the Title Authorized Member.  The Registered Agent was later changed to ANILE.

143.    On December 20, 2017, Michael Saunders & Company sold 444 Gulf of Mexico Drive, Longboat Key, Florida, to 444 Gulf of Mexico Drive, LLC for $1,750,000.  This building is a three story office building on the

bayside of Longboat Key with boat slip, and serves as the office location for OASIS.

144.    The initial payment for this property was a wire transfer the Mainstream Fund Services Account 0764 in the amount of $1,250,000 to Berlin, Patten, Ebling, PLLC on November 7, 2017.

145.    At the time of the sale, a mortgage was also recorded with Sarasota County in the amount of $500,000.  The mortgage was signed by ANILE.

146.    On January 9, 2018, a business bank account was opened at Wells Fargo Bank in the name of 444 Gulf of Mexico Drive, LLC.  The signors on the account are DACORTA and ANILE.  The bank account is funded by wires from Mainstream Fund Services Citibank Account 0764.

147.    The account is then used to make monthly mortgage payments in the amount of $2,083.83 for the property, and for various expenses, including Amazon purchases, restaurants, utilities, cable/internet bills.

148.    A Mortgage Satisfaction was filed with Sarasota County by Michael Saunders & Company for the property on November 6, 2018.  The mortgage was paid off with a wire from the Mainstream Fund Services Citibank Account 0764 in the amount of $501,655.60.

149.    In summary, more than $1,750,000 has been diverted for the purchase of this property as well as for property maintenance and other expenses. Because the property was purchased and funded with at least $1,750,000 in proceeds obtained from mail/wire fraud, it is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C). Additionally, because the purchase of the real property was conducted in violation of 18 U.S.C. § 1957(a) (it was a monetary transaction knowingly conducted with more than $10,000 in criminal derived funds), it is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

### G.    17006 VARDON TERRACE #105, LAKEWOOD RANCH, FL

150.    On August 28, 2018, DACORTA opened a Florida LLC in the name of 17006 Vardon Terrace #105, LLC to purchase the condominium located at 17005 Vardon Terrace.  DACORTA used his home address on Lost Key Place as the address of the LLC and listed himself as the Registered Agent of the LLC.  The Title Authorized Member of the LLC is Oasis Management, LLC at 13318 Lost Key Place, Lakewood Ranch, FL.

151.    On the same day, a condominium located at 17006 Vardon Terrace #105, Lakewood Ranch, FL was purchased from Lennar Homes, LLC for $182,500.  The purchaser was 17006 Vardon Terrace #105, LLC with

a mailing address of 13318 Lost Key Place, Lakewood Ranch, FL.  This is a two bedroom condominium located in the Lakewood National subdivision.

152.   The payment to purchase the property was a wire from the Oasis Wells Fargo Account 9302 in the amount of $192,169.27 to North American Title Company on August 27, 2018.

153.   Because the property was purchased with approximately $192,169.27 in proceeds obtained from mail/wire fraud, it is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C). Additionally, because the purchase of the real property was conducted in violation of 18 U.S.C. § 1957(a) (it was a monetary transaction knowingly conducted with more than $10,000 in criminal derived funds), it is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## H.   <u>16804 VARDON TERRACE #108, LAKEWOOD RANCH, FL</u>

154.   On January 29, 2018, DACORTA opened a Florida LLC in the name of 16804 Vardon Terrace #108, LLC to purchase the condominium located at 16804 Vardon Terrace.  DACORTA is listed as the Registered Agent of the corporation with his home address of 13318 Lost Key Place.  The Title Authorized Member of the corporation is Oasis Management, LLC at 13318 Lost Key Place, Lakewood Ranch, FL.

155.   On February 12, 2018, 16804 Vardon Terrace #108, Lakewood Ranch, FL was purchased from Lennar Homes, LLC for $190,000.  The purchaser was 16804 Vardon Terrace #108, LLC with a mailing address of 13318 Lost Key Place, Lakewood Ranch, FL.  This condominium is located in the Lakewood National subdivision.  DACORTA appears to have purchased this condominium for his son, who is currently residing there.

156.   The payment to purchase the property was a wire from the Oasis Wells Fargo Account 9302 in the amount of $202,777.02 to Berlin, Patten, Ebling, PPLC with a memo attached to the transaction that references a purchase of a condo for 16804 Vardon Terrace #108.

157.   Because the property was purchased with approximately $202,777.02 in proceeds obtained from mail/wire fraud, it is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C). Additionally, because the purchase of the real property was conducted in violation of 18 U.S.C. § 1957(a) (it was a monetary transaction knowingly conducted with more than $10,000 in criminal derived funds), it is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

**I.    16904 VARDON TERRACE #106, LAKEWOOD RANCH, FL**

158.   On July 10, 2018, DACORTA opened a Florida LLC in the name of 16904 Vardon Terrace #106, LLC to purchase the condominium

located at 16904 Vardon Terrace.  DACORTA is listed as the Registered

Agent of the corporation and the Title Authorized Member is Oasis

Management, LLC at 13318 Lost Key Place, Lakewood Ranch, FL.

159.   On July 13, 2018, 16904 Vardon Terrace #106 was purchased

from Lennar Homes, LLC for $187,000.  The purchaser was 16904 Vardon

Terrace #106, LLC with a mailing address of 13318 Lost Key Place,

Lakewood Ranch, FL.

160.   The payment for this condominium was made by a wire from the

Oasis Wells Fargo Account 9302 in the amount of $195,922.20 to North

American Title Company on July 13, 2018.

161.   Because the property was purchased with approximately

$195,922.20 in proceeds obtained from mail/wire fraud, it is subject to civil

forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C). Additionally, because the

purchase of the real property was conducted in violation of 18 U.S.C. §

1957(a) (it was a monetary transaction knowingly conducted with more than

$10,000 in criminal derived funds), it is subject to civil forfeiture pursuant to

18 U.S.C. § 981(a)(1)(A).

162.   As required by Supplemental Rule G(2)(f), the facts set forth

herein support a reasonable belief that the government will be able to meet its

burden of proof at trial. Specifically, they support a reasonable belief that the

government will be able to show by a preponderance of the evidence that the Defendant Properties are derived from proceeds of mail and wire fraud and a conspiracy to commit mail and wire fraud, and also constitute property involved in money laundering violations.

## CONCLUSION

WHEREFORE, pursuant to Supplemental Rule G, Plaintiff United States of America requests that this Court initiate a process of forfeiture against the Defendant Properties, and duly notice all interested parties to appear and show cause why the forfeiture should not be decreed. The United States further requests the Court order the Defendant Properties forfeited to the United States for disposition according to law and grant the United States such other and further relief as this case may require.

Dated: April 16, 2019

Respectfully submitted,

MARIA CHAPA LOPEZ,
United States Attorney

By: _____

Suzanne C. Nebesky
Assistant United States Attorney
Florida Bar No. 59377
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602
Telephone: (813) 274-6000
Facsimile: (813) 274-6220
E-mail: suzanne.nebesky@usdoj.gov

68

## **VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I, Richard Volp, declare under penalty of perjury that:

I am a Special Agent with the Federal Bureau of Investigation. I have read the foregoing Verified Complaint for Forfeiture *in Rem* and have personal knowledge that the matters alleged as fact in the Complaint are true.

I have acquired my knowledge in this matter through my personal experience, observation, investigation, and training, and from witnesses, records, and other law enforcement officers.

Executed this $\underline{16}$ day of April, 2019.

Richard Volp, Special Agent
Federal Bureau of Investigation

JS 44 (Rev. 02/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

United States of America

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Suzanne C. Nebesky, United States Attorney's Office
400 N. Tampa Street, Suite 3200, Tampa, FL 33602
(813) 274-7000

## DEFENDANTS

Assets identified in Paragraph One of the Verified Complaint

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1   U.S. Government
Plaintiff

☐ 3   Federal Question
*(U.S. Government Not a Party)*

☐ 2   U.S. Government
Defendant

☐ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | ☒ 690 Other | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | Protection Act |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | Exchange |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | ☐ 890 Other Statutory Actions |
| | Medical Malpractice | | Leave Act | | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 895 Freedom of Information |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | ☐ 899 Administrative Procedure |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | Act/Review or Appeal of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | Agency Decision |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | State Statutes |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1   Original
Proceeding

☐ 2   Removed from
State Court

☐ 3   Remanded from
Appellate Court

☐ 4   Reinstated or
Reopened

☐ 5   Transferred from
Another District
*(specify)*

☐ 6   Multidistrict
Litigation -
Transfer

☐ 8   Multidistrict
Litigation -
Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C)
Brief description of cause:
Government seeks forfeiture of real property

## VII. REQUESTED IN COMPLAINT:

☐   CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**     ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____     DOCKET NUMBER _____

DATE   4/17/19

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____